RYAN D. SABA, ESQ. (State Bar No. 192370)
MOMO TAKAHASHI, ESQ. (State Bar No. 238965)
Rosen ✧ Saba, LLP
468 North Camden Drive, Third Floor
Beverly Hills, California 90210
Telephone:   (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiff,
Edward C. Luck, Ph.D.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

EDWARD C. LUCK, Ph.D.;

Plaintiff,

v.

UNIVERSITY OF SAN DIEGO;  DAVID
SHIRK, an individual; AMI CARPENTER,
an individual; and DOES 1 through 10,
Inclusive,

Defendants.

Case No.:   **'13CV3088 JLS  BGS**

**COMPLAINT FOR:**

1. **VIOLATION OF CALIFORNIA *LABOR CODE* §970;**
2. **INTENTIONAL MISREPRESENTATION;**
3. **NEGLIGENT MISREPRESENTATION;**
4. **FRAUD BY CONCEALMENT;**
5. **CONSTRUCTIVE TERMINATION IN VIOLATION OF PUBLIC POLICY;**
6. **VIOLATION OF RIGHT TO PRIVACY;**
7. **NEGLIGENCE;**
8. **BREACH OF CONTRACT – COVENANT OF GOOD FAITH AND FAIR DEALING;**
9. **VIOLATION OF *PENAL CODE* §632;  AND**
10. **DEFAMATION**

**DEMAND FOR A JURY TRIAL**

Rosen ✧ Saba, LLP
468 North Camden Drive, Third Floor
Beverly Hills, California 90210

ROSEN ◈ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

**TO THIS HONORABLE COURT AND ALL INTERESTED PARTIES:**

Plaintiff EDWARD C. LUCK, Ph.D. asserts the following claims against Defendants UNIVERSITY OF SAN DIEGO ("University"), DAVID SHIRK ("Shirk") and AMI CARPENTER ("Carpenter") (collectively "Defendants").

## **THE PARTIES**

1.     Plaintiff Edward C. Luck, Ph.D. is a statesman, professor, author, and expert in international relations.  Dr. Luck received his Bachelor of Arts degree in international relations from Dartmouth College.  He earned his Doctorate, Masters of Philosophy, and Masters of Arts degrees from Columbia University, Graduate School of Arts and Sciences, Department of Political Science.  Dr. Luck also received a Masters of International Affairs from Columbia University.

2.     From 2008-2012, Dr. Luck served as a United Nations Assistant Secretary-General and Special Adviser to Secretary-General Ban Ki-moon. In this role, he was responsible for the conceptual, political and institutional development of the Responsibility to Protect doctrine.  From 2007-2011, Dr. Luck was employed by the International Peace Institute, an independent policy research institute, with the most recent appointment as Senior Vice President for Research and Programs. From 2001-2010, Dr. Luck was a Professor at Columbia University, School of International and Public Affairs.

3.     Dr. Luck has written well over 100 books, chapters, articles and reports about international law and organization.   Additionally, Dr. Luck has regularly testified before the United States Congress and addressed international organizations on global political and security issues.

4.     From August 1, 2012 to October 28, 2013, Dr. Luck was the Dean of University's Joan B. Kroc School of Peace Studies ("Kroc School").  Since August 1, 2012, Dr. Luck has been a tenured Full Professor at the Kroc School.

5.     Dr. Edward C. Luck resides in the state of New York.

2

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

6.     Defendant University of San Diego is a private Roman Catholic university located in San Diego, California.  The University is a corporation organized in the State of California with its principal place of business in San Diego. The University comprises of seven different academic colleges, including the Kroc School.

7.     The Kroc School opened in 2007 and was established through Joan Kroc's gift of $75 million "to not only teach peace, but make peace."  The goal of the Kroc School is to promote sustainable peace and justice through innovative education, interdisciplinary scholarship, advanced practice and policy engagement. The one-year master's curriculum in Peace and Justice Studies is interdisciplinary and the Kroc School has its own core faculty, curriculum, dedicated facility and students.  Areas of focus include conflict analysis and resolution, human rights, development and human security.  Cross-campus research and programs are also undertaken that involve USD's other schools and faculties.

8.     The Kroc School has two practice-oriented institutes – the Institute for Peace & Justice ("IPJ") and the Trans-Border Institute ("TBI").

9.     The IPJ was established in 2001 and in 2007 was integrated into the newly created Kroc School.  The IPJ works locally, nationally and internationally to build peace with justice by strengthening woman peacemakers, youth leaders and human rights defenders.

10.   The TBI was created in 1994 and was also integrated into the Kroc School in 2007.  The TBI has two main objectives: (a) to promote border related scholarship, activities and publications at the University; and (b) to promote an active role for the University in the cross border community.

11.   Defendant Shirk is an individual who resides in San Diego, California and is a tenured Associate Professor in the Department of Political Science and International Relations at the University.  From 2003-2013, Shirk was the Director of TBI until he was forced to resign from this position in March 2013.

12.   Defendant Carpenter is an individual who resides in San Diego, California and is an untenured Assistant Professor at the Kroc School.

13.   The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names.  Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Defendants fictitiously named herein as a DOE is legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and proximately caused the injuries and damages to Plaintiff hereinafter alleged.  Plaintiff will seek leave of Court to amend this Complaint to assert the true names and/or capacities of such fictitiously named Defendants when the same have been ascertained.

14.   At all relevant times, Defendants Shirk and Carpenter were employed by the University and were acting as authorized agents for the University.

## **JURISDICTION**

15.   This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1332.

16.   Venue is proper in the Southern District of California pursuant to 28 U.S.C. §1391(b)(1) and (2).

## **GENERAL ALLEGATIONS**

**The Recruitment of Edward C. Luck, Ph.D. to be Dean of the Kroc School**

17.   Since its inception in 2007, the Kroc School was poorly managed and dysfunctional.  After years of problems and internal turmoil, the University decided to conduct an extensive search and hire a new Dean of the Kroc School.

18.   In October 2011, the University began to search for a new Dean of the Kroc School.  The search was headed by a Search Committee, chaired by the Dean

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

of the School of Leadership and Education Sciences, Paula Cordeiro, Ph.D. and the Provost and Executive Vice President, Julie Sullivan, Ph.D. The Search Committee members included, amongst others: a USD Trustee, Dr. Constance Carroll; the Interim Dean of the Kroc School, Dr. Lee Ann Otto; the Assistant Dean of The Kroc School Administration, Mr. Louis Cappella; the Dean of the School of Law, Stephen Ferruolo, Esq.; Defendant Shirk; and several other administrators and faculty of the University ("Search Committee").

19.    As part of the search, the University engaged a search firm, Heidrick & Struggles, to advise and assist it during the executive search.  The University, in collaboration with Heidrick & Struggles, published an Organization, Position & Person Profile ("Profile") document for candidates to review when considering the Dean position. The Profile provided a detailed description of the job responsibilities for the position, including an expectation that the Dean would "provide overall leadership of the School's programs and learning initiatives."  However, the Profile concealed that the proposed candidate would be required to lead the Kroc School with a collective governance philosophy. The Profile also purposefully concealed the nature and extent of problems that already existed at the Kroc School.

20.    Instead, the Profile only advised a potential candidate that the Dean would be required to "collaborate with faculty to maintain an environment that fosters academic excellence."  The recruitment document emphasized that the ideal candidate should be a "strong leader" who was expected to "lead in a university culture."  The Profile also called for a leader who was dynamic, strategic, and visionary.  Relying upon this recruitment document, Dr. Luck agreed to be considered as a candidate for the position of the Kroc School Dean.

21.    In addition to the Profile, the University also recruited Dr. Luck by providing him with two documents entitled "Strategic Plan 2011-2016" and "Strategic Priorities 2011-2012." Importantly, these documents were silent regarding an expectation that the Dean lead with a collective governance

ROSEN ✧ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

philosophy.   Dr. Luck also materially relied upon the representations in this document prior to accepting the position of Dean.

22.    Ultimately after his employment began with the University, Dr. Luck was expected to lead within the confines of a collective governance philosophy in which individual subordinates had veto power over management decisions.

23.    During the lengthy and intensive recruitment process, Dr. Luck participated in numerous conversations, in-person meetings, and interactions on and off campus with the Search Committee.  At all times, while attempting to recruit Dr. Luck, University personnel and leadership stressed the desire and need for strong and visionary leadership to increase the University's international prominence and to elevate the University's reputation and visibility in the academic community. Dr. Luck was repeatedly told that as Dean, he could and would lead the Kroc School by acting independently and performing the necessary duties to raise the School's public profile, academic standing, policy relevance, and stature amongst other similar schools.

24.    Dr. Luck was first approached about the position on or about July 3, 2011, by Dr. Necla Tschirgi, a Kroc School Professor and member of the Search Committee.   During this first conversation, Dr. Tschirgi emphasized that an ideal candidate needed to be a "strong leader" to take the School to a higher level and that Dr. Luck was an ideal candidate.  Similarly, on December 28, 2011, the principal of Heidrick & Struggles, Ellen Brown, met with Dr. Luck and also stressed the need for gaining greater visibility for the Kroc School  and the need for strong leadership.

25.    At no time during the recruitment process did anyone ever advise Dr. Luck that the University expected the prospective Dean lead in an environment where individual subordinates had veto power over management decisions. Moreover, no one ever advised Dr. Luck about the Kroc School's history of internal conflict and lax management. Indeed, in or about October 2013, well after Dr. Luck

ROSEN ❖ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

accepted the position, a member of the University's Search Committee, Associate Dean Lee Ann Otto, informed Dr. Luck that the Search Committee deliberately withheld pertinent and negative information about the Kroc School's flawed and inadequate management during the recruitment process because the University wanted Dr. Luck to accept the position.

26.    During the recruitment process, Dr. Luck was specifically told by Dr. Julie Sullivan, the Provost and Executive Vice President of the University, to whom the Dean of the Kroc School would report, that he would be expected to lead the School in the manner that he felt was most appropriate, that the University would support his efforts to reform and reorient the School, and that he would not have to seek approval for governance decisions.

27.    When Dr. Luck ultimately accepted the position of Dean on May 29, 2012, after an eleven month courtship with the University, he naturally expected the initial transition period to be difficult because he would have to make unpopular decisions in order to lead the Kroc School to a higher level – such as bringing in new faculty, integrating the two Institutes more fully into the work and management of the School, and reassigning staff responsibilities as needed. However, leading up to Dr. Luck's decision to accept the position, it was represented to him by several members of the Search Committee, including the Provost Julie Sullivan, that the University was seeking dynamic leadership, would support his governing style, his reasonable decisions, and his unwavering commitment to maintaining the core values and standards of the University.  On April 30, 2012, Provost Sullivan even went so far as to say that Dr. Luck was the first candidate she had ever encountered for any post of whom no one had anything negative to say  during the background investigation.

28.    Moreover, Dr. Luck was told that the faculty and administration were ready to embrace change.  During the recruitment process, Dr. Luck was specifically told that the University was looking for a visionary who could lead the

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

ROSEN ◊ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

Kroc School to higher visibility, academic standing, policy relevance and stature. Dr. Luck told the Search Committee during multiple interviews that he would accept the position with the understanding that the University wanted a higher level of national and international prominence and that he would be empowered to institute changes necessary to attain this prominence.

29.    During the lengthy recruitment process, Dr. Luck engaged in several discussions with, met in person with, and engaged in both on and off campus conversations with many University personnel who painted what turned out to be a false picture of Dr. Luck's role as the potential Dean.  These communications and meetings included:

(a)    Dr. Luck had three in-person meetings and several telephone conversations and email exchanges with the Executive Vice President and Provost Julie Sullivan;

(b)    In-person meetings, telephone conferences, a telephone interview and nearly 40 emails from the principal of Heidrick & Struggles, Ellen Brown, and over 35 emails from other Heidrick & Struggles staff members;

(c)    Meetings with the University Search Committee, including, but not limited to:  Dr. Paula Cordeiro, the Dean of the School of Leadership and Education Sciences; Dr. Julie Sullivan, the Provost and Executive Vice President; the Dean of the Law School; a Kroc School Advisory Board member, Todd Johnson; a current  graduate student in the School; the School's Associate and Assistant Deans ; and Kroc School Professor of Practice Necla Tschirgi;

(d)    A comprehensive two day on-campus visit from March 22, 2012 to March 23, 2012, with multiple presentations and meetings with most of the top University administrators, including Dr. Mary Lyons, the President of the University.

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

30.    In order to meet the University's expectation that Dr. Luck should strengthen the Kroc School   and raise it to a higher level, the following representations were repeatedly made by Provost Julie Sullivan and other top University representatives and officials from  July 2011 through May 2012 to Dr. Luck:

    (a)    That he would have independent authority to act as Dean and manage the Kroc School;

    (b)    That he would have the autonomy to hire more qualified faculty and administrators and to reassign or remove others as necessary to increase the academic reputation and international and national prominence of the Kroc School;

    (c)    That he would have the power to discipline faculty and administrators who commit misconduct or act in a manner detrimental to the goals of the Kroc School;

    (d)    That he would have the right to institute significant policy changes to the employment environment without the approval of anyone;

    (e)     That he could take steps to more fully integrate the different parts of the School into a more coherent whole; and

    (f)    That he would independently and prudently manage the Kroc School fiscal resources.

31.    All such decisions are normally within the authority of Deans at this and other universities, as the Dean is ultimately responsible for the financial health, the compliance with federal and state laws and regulations, and administrative and human resource practices, as well as the academic quality, of the school she or he heads.  Accountability flows from responsibility coupled with authority, so Deans require full knowledge and control of those decisions and practices within the school that could affect accountability.

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

32.     Based upon the affirmative representations by the Provost and other University Search Committee personnel, Dr. Luck accepted the position of Dean of the Kroc School and entered into an employment contract with the University dated May 23, 2012, with an effective date of August 1, 2012.  Dr. Luck and the University expected that his employment would last at least five years. The employment contract states, "we expect your initial appointment as Dean to extend for a period of five years with the option of review and potential renewal, if mutually agreed upon, beyond that point."  With renewal, the tenure as Dean could be up to ten years. The contract provided that Dr. Luck would be Dean of the Kroc School  and be a tenured Full Professor in exchange for a salary and benefits. The contract was silent in regard to how Dr. Luck was to perform his job functions as Dean and did not state that the University expected him to adhere to a collective governance philosophy.  As is normal practice, the appointment of a tenured Full Professor is considered to be open-ended in terms of its duration, so Dr. Luck had every reason to believe that the University expected that this appointment was for the remainder of his working life.  This was his expectation as well.

33.     At the time Dr. Luck was recruited, and when Dr. Luck entered into the employment contract, he resided in the State of New York.  Based upon the representations made by the University about the kind, character and duration of employment, Dr. Luck moved from the State of New York to San Diego, California in order to work for the University.

### Dr. Luck Was Misled by the University about His Authority to Govern

34.     The representations about the employment character of the job as Dean were false.  As soon as Dr. Luck began to identify serious problems with the financial, human resource, and administrative practices at the Kroc School and began to take steps to correct them, the tone of his interactions with the University leadership began to change and he was suddenly informed that he would have to the independent authority that he was told he had.  It was not until Dr. Luck began

his employment as Dean and was already attempting to initiate necessary changes to improve the functioning of the Kroc School that he was advised that he did not have any actual independent authority.  Instead, he was expected to lead within the confines of a collective governance philosophy in which individual subordinates had veto power over management decisions.  The Kroc School and University expected him to: (a) seek approval from faculty and administrators on all hiring, reassignment, and termination decisions; (b) seek approval from junior faculty and administrators before instituting even minor administrative steps to ensure accountability and curb unnecessary expenditures, not to mention any significant policy changes to the employment environment; and (c) seek approval from faculty and administrators before disciplining any employees who had committed misconduct or acted in a manner detrimental to the goals of the Kroc School  or had repeatedly violated the rules, procedures, and  values of the University.  At the same time, the University insisted that Dean Luck not explain to the staff and faculty of the School the reasons why he or the University took a number of administrative steps that were controversial. Effectively, Dr. Luck was powerless to make the necessary, critical, and sometimes unpopular changes previously and repeatedly represented to him by the University as needed to improve the School.

**The Criminal Misconduct of Defendant Shirk**

35.    At the outset of his employment as Dean in August 2012, Dr. Luck discovered that within the Kroc School there was pervasive disrespect for authority and disdain for oversight, coupled with a culture of entitlement and impunity instead of accountability and responsibility.  For instance, months before he arrived, the three Kroc School junior faculty members, including Ami Carpenter, had threatened the Provost that they would resign en masse if they did not get the raise they wanted. Dr. Luck was also urged by faculty and staff to authorize actions and practices that would have violated University rules and/or common professional standards.

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

36.     Unlike the previous Dean of the Kroc School, Dr. Luck was unwilling to sign authorization forms without asking questions or to delegate his core oversight responsibilities to a low level assistant. He took his legal and fiscal responsibilities seriously. Early on, Dr. Luck realized it was going to take an enormous amount of time and effort, as well as difficult management decisions, to correct the extensive financial and personnel problems at the Kroc School and to ensure its financial and administrative integrity.

37.     Recognizing that he had to be fully accountable for the finances and administrative practices at the Kroc School, Dean Luck exercised close oversight of the work of the two institutes as well as the academic standards of the School as a whole.   He soon discovered significant problems with the financial and administrative practices of Defendant David Shirk as the Director of TBI.

38.     From September 2012-January 2013, Shirk, who directly reported to Dr. Luck, refused to follow University rules and procedures or to acknowledge Dr. Luck's authority.  Upon close examination, Dr. Luck discovered that Shirk was significantly mismanaging  TBI by misappropriating funds, by not appropriately supervising the  staff and students who worked for TBI, by offering financial gifts of University funds to individuals without any work product expected in return, by inappropriately gaining access to the personal information of all Kroc School faculty and staff, as well as of the Political Science and International Relations Department faculty, by giving official University identity cards and titles to individuals who had no formal affiliation with the University, and by violating FERPA regulations.

39.     On March 6, 2013, Dr. Luck relieved Shirk of his management responsibilities for TBI.  In response, Shirk appealed to Provost Sullivan of the University, complaining that Dr. Luck did not have the authority to make such a decision.

ROSEN ✧ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

40.     On March 11, 2013, Dr. Luck, Shirk, Provost Sullivan, Associate Dean Lee Ann Otto and incoming Interim Provost Andy Allen met to discuss the decision to relieve Shirk of his management responsibilities.  Provost Sullivan overruled Dr. Luck's decision to relieve Shirk of his responsibilities.  Provost Sullivan then declared that she was making the decision to remove Shirk as the Director of TBI.

41.     On March 22, 2013, Shirk circulated a 10 page memorandum to faculty and others across campus that was filled with slanderous and personal attacks against Dr. Luck, as well as distortions and misleading statements.

42.     On March 25, 2013, the University discovered that Shirk was surreptitiously recording conversations between himself and numerous University personnel, including Dr. Luck.  Shirk was using an electronic device to record conversations that Dr. Luck and others did not know were being recorded, nor did Dr. Luck or the other individuals consent to the recordings.  One of the over 30 known conversations recorded by Shirk was the March 11, 2013 meeting with Dr. Luck, Shirk and the Provost.  In addition, meetings with Dr. Luck on February 5, 2013, February 12, 2013, and March 6, 2013, were secretly recorded.

43.     On April 29, 2013, Shirk instructed an attorney to deliver a letter to the University threatening litigation regarding his employment and intellectual property.

44.     On May 15, 2013, the University discovered that Shirk was storing nude photographs of himself on a University computer account. Additionally, there were also nude photographs of women.  These were accessible by workers and undergraduate students associated with TBI.

45.     As Director of TBI and an Associate Professor in the undergraduate College of Arts and Sciences, Dr. Shirk should have known that it is not appropriate to have nude photographs stored in electronic files paid for by the University. When Shirk was confronted about these inappropriate photographs, he lied and attempted to deceive the University and Dr. Luck.   Instead of accepting

responsibility, Shirk was evasive and attempted to justify the existence of the photographs as his "intellectual private property" even though they were stored in files paid for by the University and were accessible to workers and undergraduate students.

46.    Dr. Luck advised the University General Counsel Kelly Douglas and the Provost Julie Sullivan that strong action was required, that Shirk's illegal tapings should be reported to the local police, and that all faculty, staff, students, or visitors whose rights were violated by the tapings should be notified, along with those faculty and staff whose files with private information may have been violated as well.    Additionally, Dr. Luck insisted that the University hire an outside investigator to determine the extent of the misconduct because there was also a concern that Shirk may have misappropriated or misused University funds. None of these steps were taken.

47.    However, since Shirk hired a lawyer and threatened to sue the University, Ms. Douglas emphasized that she and the University did not want to escalate the situation. So, instead of appropriately conducting an independent investigation into Shirk's misconduct and crimes, Ms. Douglas decided that the University should avoid the conflict with Shirk.  Although his title of Director of TBI was taken away, there was only a superficial internal investigation and Shirk was not reported to the police. Defendant Shirk returned to his post as an Associate Professor in the Department of Political Science and International Relations and his compensation as Director of TBI was maintained until the end of the fiscal year.

48.    The passive approach by the University allowed Shirk to employ University facilities and communication channels to continue and even escalate his cross-campus smear campaign against Dr. Luck.  The University refused to make any statement or take any action to curb Shirk's conduct, while telling Dr. Luck that he could not respond to the attacks.

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

Rosen ◇ Saba, LLP
468 North Camden Drive, Third Floor
Beverly Hills, California 90210

49.     In retaliation for being removed from his role as Director of TBI, Shirk intensified his campaign of lies and distortions to undermine and discredit Dr. Luck.  Shirk sent a series of emails, memos, and correspondence to many faculty, administrators and others both in the Kroc School and elsewhere in the University. The core purpose of these communications was to degrade and criticize Dr. Luck for alleged management overreach and to stir opposition to his leadership as Dean. Dr. Shirk held a series of meetings with staff and faculty members of the Kroc School and the College of Arts and Sciences to paint himself as the victim of Dr. Luck's allegedly authoritarian management style.

50.     Dr. Luck repeatedly asked the Provost, Interim Provost, and General Counsel to have the University step in to have these memos rescinded or corrected and to tell Shirk to cease his malicious and deeply personal campaign against Dr. Luck. They refused, instead insisting that Dean Luck not say anything about the actions taken by the University regarding TBI or the reasons for them. Furthermore, the University's repeated efforts to silence Dean Luck and its failure to authorize an independent investigation and/or to report Shirk to the police only encouraged Shirk to escalate his attacks on Dean Luck.

**Defendant Carpenter Makes a False Charge of Discrimination**

51.     Defendant Carpenter is an untenured Assistant Professor of marginal academic abilities.   She failed in her initial effort to secure tenure in the spring of 2012, before Dean Luck was hired.  She is engaged in a desperate and relentless campaign to gain tenure and promotion to the rank of Associate Professor in the spring of 2014—her last opportunity.  Her conduct towards Dr. Luck has been confrontational, unprofessional, demanding, and undermining since the early days of his tenure.  She has disrupted both faculty and all school meetings to attack Dr. Luck and to try to rally opposition to him.  In the fall of 2012, Provost Julie Sullivan told Dr. Luck that she had deep doubts about whether Carpenter should receive tenure.

ROSEN ✧ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

52.     Dr. Luck expressed concerns to Carpenter about her readiness to assume the responsibility of serving  as Principal Investigator  of a federal grant that had acute risk management implications for the Kroc School   and the University  both because of its recruitment  of human subjects, including prisoners and local gang members, and its focus on sex trafficking and children.  Some of his concerns were the following: (1) Carpenter's ability to manage money was questionable because, among other things, her University  credit card had been revoked because she improperly used the credit card for personal purchases; (2) Carpenter failed to meet deadlines and to keep her superiors, including Dr. Luck, apprised of the status and approval of the grant; (3) Carpenter issued unauthorized and premature press statements about the grant without University, Kroc School  or Department of Justice approval; (4) Carpenter's budget for the grant was poorly conceived and managed; (5) Carpenter had trouble meeting the requirements of  the Institutional Review Board process and made false statements during the review process; and (6) the grant was poorly planned and executed, leading to disorganization and delay.

53.     In response to this criticism by Dr. Luck, Carpenter retaliated against him by making a malicious and false report to the University that Dr. Luck was discriminating against women.  Without any factual basis or evidence, Defendant Carpenter maliciously and falsely advised the University that Dr. Luck was acting inequitably toward women.

54.     The University accepted the complaint of discrimination and hired outside legal counsel, Jennifer Branch, Esq. of the law firm Andrews, Lagasse, Branch & Bell, LLP, to conduct an investigation of the alleged discrimination. Upon information and belief, Ms. Branch is an employment lawyer who is qualified to conduct an employment discrimination investigation.

55.     In stark contrast to the University's total lack of action in addressing Shirk's prurient, inappropriate and illegal behavior, Ms. Branch conducted an

investigation of a malicious and baseless discrimination complaint.  During the course of her investigation, Ms. Branch conducted 18 interviews for the avowed purpose of discovering information about whether Dr. Luck discriminated against women.

### The Jennifer Branch Letter

56.    Upon the conclusion of her investigation, on October 9, 2013, Ms. Branch delivered a letter to the University General Counsel, Ms. Douglas.  The letter concludes that there was no evidence to support Carpenter's allegations of gender discrimination against Dr. Luck.  The letter should have concluded at that point.  However, it did not.

57.    Instead, the letter came to the preposterous conclusion that all of the problems of the Kroc School are due to Dr. Luck's management style rather than to deep-seeded issues that long predated his tenure.  Even though Ms. Branch was hired to investigate gender discrimination, at some point, Ms. Douglas, as General Counsel for the University, instructed or ratified the decision by Ms. Branch to also investigate Dr. Luck's ability to be an effective leader of the Kroc School.

58.    However, Ms. Branch is not qualified to conduct an investigation of the effectiveness of the management style of a Dean or any other academic official.  Furthermore, Ms. Branch, displaying clear selection bias, did not interview all of the necessary and relevant persons for an investigation into the management style of Dr. Luck.  Finally, Ms. Branch was not transparent during her investigation of witnesses because she did not advise them that she was acting in a dual role and was investigating both the alleged discrimination and the management effectiveness of Dr. Luck.  Ms. Branch only advised witnesses that she was investigating the alleged discrimination.  This failure to be transparent led to incomplete evidence gathering and interviews that relied heavily on hearsay and second or third hand gossip rather than direct experience.

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

59.     As an example, when Ms. Branch interviewed Dr. Luck, she failed to advise him that she was investigating his ability to be an effective leader, nor did she provide him the opportunity to respond to material statements that were allegedly made by others who were interviewed. This covert and superficial investigation fails to meet the most rudimentary standards of impartiality.   The resulting letter is deeply prejudicial and Ms. Branch failed to provide Dr. Luck with due process to respond to the allegations.    The result is a collection of unsubstantiated and unattributed complaints based on false or distorted information. Moreover, the letter also fails to acknowledge the preexisting leadership problems and mismanagement of the Kroc School that predated Dr. Luck's employment, but instead assumes and concludes that the history of the Kroc School began with Dr. Luck.

60.     The letter's existence is problematic because it may be construed by others as if it is the result of a careful, thorough and balanced investigation.   Dr. Luck requested that the University retract the letter, or at a minimum, redact the portions of the letter that are beyond the scope of the discrimination investigation. However, Ms. Douglas and Interim Provost Andrew Allen refused to do so.

61.     The University further aggravated the situation when Ms. Douglas and others failed to maintain its confidential nature and attorney-client privilege of the letter.   Ms. Douglas and others provided the letter to persons who should never have received a copy of the letter, including providing a copy of the letter to Carpenter.   Any confidentiality or privilege that would have been associated with the letter was waived when the University delivered the letter to non-essential personnel, including at least one of Dr. Luck's subordinates.   The only purpose of delivering this letter to any subordinates of Dr. Luck was to humiliate and discredit him and to undermine his authority. Upon information and belief, Carpenter has provided others with a copy of the letter or informed others of the contents within the letter.

62.     On October 15, 2013, Interim Provost Andrew Allen, citing the Branch letter, threatened Dr. Luck that unless he changed his management style at the Kroc School, he would lose his job as Dean.

63.     On October 28, 2013, Dr. Luck resigned as Dean of the Kroc School.

## FIRST CAUSE OF ACTION

## VIOLATION OF CALIFORNIA *LABOR CODE* §970

## Against Defendants University of San Diego and DOES 1-10

64.     Plaintiff incorporates by reference paragraphs 1-63 of this Complaint as if fully set forth herein.

65.     Beginning in July 2011, through May 2012, the University recruitment personnel made false representations to Dr. Luck about the kind and character of work, in order to persuade Dr. Luck to move from New York to California and change his residence.

66.     At all times when the authorized agents of the University made these false representations, they knew that the representations were not true.

67.     At all times, the authorized representatives of the University intended for Dr. Luck to rely on the representations.

68.     Dr. Luck reasonably relied on the false representations and changed his residence from New York to California for the sole purpose of working for the University.

69.     During the course of employment with the University, Dr. Luck performed his various responsibilities in an exemplary fashion and capably performed each and every condition of the employment agreement.   Dr. Luck remained employed by University until October 28, 2013, when he resigned as Dean of the Kroc School. By reason of the misrepresentations, and as a proximate result of those representations, Dr. Luck has suffered damage to his professional reputation and continues to suffer substantial losses in earnings, bonuses, deferred

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

compensation, and other employment benefits that he would have received had the University not made such false representations, plus expenses incurred in obtaining substitute employment and relocating back to New York, all to his damage in an amount according to proof.

70. As a direct and proximate result of the aforesaid conduct of the University and DOES 1 through 10, Dr. Luck has suffered severe damage to his professional reputation and emotional distress, including, but not limited to, fear, humiliation, embarrassment, mental anguish, and depression all to his general damage, in an amount to be stated according to proof at trial.

71. As a direct and proximate result of the aforesaid wrongful conduct of the University and DOES 1 through 10, Dr. Luck has suffered economic harm, including, but not limited to, a loss of past and future earnings, as well as a loss of earning capacity and employment benefits, and consequential damages, all within the jurisdictional limits of this court. The exact amount of said losses will be stated according to proof at trial.

72. Dr. Luck also seeks all available statutory damages, including but not limited to, double damages as set forth in California *Labor Code* §972.

73. Dr. Luck is also entitled to punitive and exemplary damages against the University and DOES 1 through 10 in a sum in excess of the minimum jurisdictional limits of the Court.

## SECOND CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION

### Against Defendants University of San Diego and DOES 1-10

74. Plaintiff incorporates by reference paragraphs 1-63 of this Complaint as if fully set forth herein.

75. Beginning in July 2011, through May 2012, the University recruitment personnel made false representations about the nature of the position of Dean of the

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

1  Kroc School, in order to persuade Dr. Luck to accept the position.

2        76.    The representations that were made were false.

3        77.    At all times when the authorized agents of the University made these

4  false representations, they knew that the representations were not true when they

5  were made to Dr. Luck and they made the representations recklessly and without

6  regard for the truth.

7        78.    The University intended that Dr. Luck rely on the representations.

8        79.    Dr. Luck reasonably relied on the representations of the authorized

9  agents of the University.

10        80.    Dr. Luck was harmed and his reliance on the representations was a

11  substantial factor in causing his harm.

12        81.    As a direct and proximate result of the aforesaid conduct of the

13  University and DOES 1 through 10, Dr. Luck has suffered severe damage to his

14  professional reputation and emotional distress, including, but not limited to, fear,

15  humiliation, embarrassment, mental anguish, and depression all to his general

16  damage, in an amount to be stated according to proof at trial.

17        82.    As a direct and proximate result of the aforesaid wrongful conduct of

18  the University and DOES 1 through 10, Dr. Luck has suffered economic harm,

19  including, but not limited to, a loss of past and future earnings, as well as a loss of

20  earning capacity and employment benefits, and consequential damages, all within

21  the jurisdictional limits of this court.  The exact amount of said losses will be stated

22  according to proof at trial.

23        83.    Dr. Luck is also entitled to punitive and exemplary damages against

24  the University and DOES 1 through 10 in a sum in excess of the minimum

25  jurisdictional limits of the Court.

26

27

28

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

## THIRD CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

84.    Plaintiff incorporates by reference paragraphs 1-63 of this Complaint as if fully set forth herein.

85.    Beginning in July 2011, through May 2012, the University recruitment personnel made important and false representations about the nature of the position of Dean of the Kroc School, in order to persuade Dr. Luck to accept the position.

86.    The representations that were made were false.

87.    At all times when the authorized agents of the University made these false representations, they may have honestly believed that the representations were true, but the University had no reasonable grounds for believing that the representations were true when they were made.

88.    The University intended that Dr. Luck rely on the representations.

89.    Dr. Luck reasonably relied on the representation of the authorized agents of the University.

90.    Dr. Luck was harmed and Dr. Luck's reliance on the representations were a substantial factor in causing his harm.

91.    As a direct and proximate result of the aforesaid conduct of the University and DOES 1 through 10, Dr. Luck has suffered severe damage to his professional reputation and emotional distress, including, but not limited to, fear, humiliation, embarrassment, mental anguish, and depression all to his general damage, in an amount to be stated according to proof at trial.

92.    As a direct and proximate result of the aforesaid wrongful conduct of the University and DOES 1 through 10, Dr. Luck has suffered economic harm, including, but not limited to, a loss of past and future earnings, as well as a loss of earning capacity and employment benefits, and consequential damages, all within the jurisdictional limits of this court.  The exact amount of said losses will be stated according to proof at trial.

**FOURTH CAUSE OF ACTION**

**FRAUD BY CONCEALMENT**

**Against Defendants University of San Diego and DOES 1-10**

93.    Plaintiff incorporates by reference paragraphs 1-63 of this complaint as if fully set forth herein.

94.    During the recruitment process, the University, through the Search Committee, intentionally failed to disclose material facts to Dr. Luck, and intentionally failed to disclose other important facts, making the University's disclosures deceptive, including:

(a)    That Dr. Luck would have no independent authority to act as Dean and manage the Kroc School;

(b)    That Dr. Luck would not have the autonomy to hire qualified faculty and administrators, to increase the national and international prominence of the Kroc School, to take steps to more fully integrate the different components of the School, to reassign staff as needed, or to terminate staff when necessary to strengthen the School   and enhance its compliance with national and state laws or University regulations and policies;

(c)    That Dr. Luck would not have the power to discipline faculty and administrators who commit misconduct or act in a manner detrimental to the goals of the Kroc School;

(d)    That Dr. Luck would not have the right to institute significant policy changes to the employment environment without the approval of anyone;

(e)     That Dr. Luck would not have the authority to introduce new programmatic or thematic ideas;

(f)    That Dr. Luck would not independently manage the Kroc School fiscal resources; and

(g)    That Dr. Luck would be required to manage within the confines of a collective governance philosophy in which individual subordinates had veto power

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

over management decisions.

95.   Dr. Luck did not know of the concealed facts and the University intended to deceive him by concealing these facts to persuade him to accept the position of Dean of Kroc School within the University.

96.   Dr. Luck reasonably relied on the University's deception and lack of disclosures.

97.   The concealment was a substantial factor in causing Dr. Luck's harm.

98.   As a direct and proximate result of the aforesaid conduct of the University and DOES 1 through 10, Dr. Luck has suffered severe damage to his professional reputation and emotional distress, including, but not limited to, fear, humiliation, embarrassment, mental anguish, and depression, all to his general damage, in an amount to be stated according to proof at trial.

99.   As a direct and proximate result of the aforesaid wrongful conduct of the University and DOES 1 through 10, Dr. Luck has suffered economic harm, including, but not limited to, a loss of past and future earnings, as well as a loss of earning capacity and employment benefits, and consequential damages, all within the jurisdictional limits of this court.  The exact amount of said losses will be stated according to proof at trial.

100.   Dr. Luck is also entitled to punitive and exemplary damages against the University and DOES 1 through 10 in a sum in excess of the minimum jurisdictional limits of the Court.

## FIFTH CAUSE OF ACTION

### CONSTRUCTIVE TERMINATION IN VIOLATION OF PUBLIC POLICY Against Defendants University of San Diego and DOES 1-10

101.   Plaintiff incorporates by reference paragraphs 1-63 of this complaint as if fully set forth herein.

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

102.   Dr. Edward C. Luck was hired by the University on or about August 1, 2012.

103.   Dr. Luck performed his duties as contemplated by the parties when he was hired.

104.   Notwithstanding the unlawful actions, invasion of privacy and damage to his reputation, Dr. Luck dutifully performed his job duties.

105.   The University caused Dr. Luck to be constructively terminated on or about October 28, 2013, when he was forced to leave his employment after protesting about the University's violation of public policy.  It is a violation of California public policy to:

(a)   Fail to report Shirk's criminal and illegal secret electronic recordings; and;

(b)   Fail to protect Plaintiff's constitutional right to privacy by disseminating the Branch letter to non-essential personnel and subordinates of Dr. Luck.

106.   Accordingly, Plaintiff's constructive termination was in violation of public policy since the University condoned and/or ratified the illegal conduct of Shirk.   Furthermore, the University violated public policy when Ms. Douglas delivered the Branch letter (which contained private details of Dr. Luck's employment) to Dr. Luck's subordinates and other non-essential personnel.

107.   The above actions by the University were a substantial motivating reason for Dr. Luck's constructive discharge.

108.   As a direct and proximate result of the aforesaid conduct of the University and DOES 1 through 10, Dr. Luck has suffered severe damage to his professional reputation and emotional distress, including, but not limited to, fear, humiliation, embarrassment, mental anguish, and depression, all to his general damage, in an amount to be stated according to proof at trial.

109.   As a direct and proximate result of the aforesaid wrongful conduct of the University and DOES 1 through 10, Dr. Luck has suffered economic harm, including, but not limited to, a loss of past and future earnings, as well as a loss of earning capacity and employment benefits, and consequential damages, all within the jurisdictional limits of this court.  The exact amount of said losses will be stated according to proof at trial.

## SIXTH CAUSE OF ACTION

## VIOLATION OF RIGHT TO PRIVACY

### Against Defendants University of San Diego and DOES 1-10

110.   Plaintiff incorporates by reference paragraphs 1-63d of this complaint as if fully set forth herein.

111.   It is the public policy in the State of California that an employee is entitled to privacy about his employment.  Dr. Edward C. Luck had a reasonable expectation of privacy in the investigation by Ms. Branch and any resulting written reports related to the investigation regarding the discrimination allegations made against him by Defendant Carpenter.

112.   Defendants intentionally breached this right by distributing confidential employment information and the Branch letter.

113.   Defendant's failure to protect Plaintiff's constitutional right to privacy was highly offensive and would be to a reasonable person.

114.   Plaintiff Edward C. Luck, Ph.D. was harmed by Defendants' intentional intrusion and dissemination of confidential, privileged investigation information and Branch letter and Defendants' conduct was a substantial factor in causing Plaintiff Edward C. Luck, Ph.D.'s harm.

115.   As a direct and proximate result of the aforesaid conduct of the University and DOES 1 through 10, Dr. Luck has suffered severe damage to his professional reputation and emotional distress, including, but not limited to, fear,

ROSEN ✧ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

26

1   humiliation, embarrassment, mental anguish, and depression, all to his general

2   damage, in an amount to be stated according to proof at trial.

3      116.   As a direct and proximate result of the aforesaid wrongful conduct of

4   the University and DOES 1 through 10, Dr. Luck has suffered economic harm,

5   including, but not limited to, a loss of past and future earnings, as well as a loss of

6   earning capacity and employment benefits, and consequential damages, all within

7   the jurisdictional limits of this court.  The exact amount of said losses will be stated

8   according to proof at trial.

9

10                     **SEVENTH CAUSE OF ACTION**

11                            **NEGLIGENCE**

12     **Against Defendants University of San Diego and DOES 1-10**

13     117.   Plaintiff incorporates by reference paragraphs 1-63 of this complaint as

14   if fully set forth herein.

15     118.   Defendants had a duty to Dr. Luck to:

16     a.     Hire a qualified investigator to conduct an investigation of the

17   management of the Kroc School;

18     b.     Conduct a complete investigation that is fully transparent and provides

19   Dr. Luck with the due process to respond to the allegations made by certain

20   individuals about his management abilities; and

21     c.     Not to distribute the results of the investigation or the written report to

22   subordinates of Dr. Luck or other non-essential personnel.

23     119.   The University breached the above mentioned duties and the breach of

24   these duties was a substantial factor in causing harm to Dr. Luck.

25     120.   As a direct and proximate result of the aforesaid conduct of the

26   University and DOES 1 through 10, Dr. Luck has suffered severe damage to his

27   professional reputation and emotional distress, including, but not limited to, fear,

28   humiliation, embarrassment, mental anguish, and depression, all to his general

ROSEN ✧ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

27

damage, in an amount to be stated according to proof at trial.

121.   As a direct and proximate result of the aforesaid wrongful conduct of the University and DOES 1 through 10, Dr. Luck has suffered economic harm, including, but not limited to, a loss of past and future earnings, as well as a loss of earning capacity and employment benefits, and consequential damages, all within the jurisdictional limits of this court.  The exact amount of said losses will be stated according to proof at trial.

## EIGHTH CAUSE OF ACTION
### BREACH OF CONTRACT – COVENANT OF GOOD FAITH AND FAIR DEALING
### Against Defendant University of San Diego and DOES 1-10

122.   Plaintiff incorporates by reference paragraphs 1-63 of this complaint as if fully set forth herein.

123.   The written employment contract entered into by and between Dr. Luck and the University contained an implied covenant of good faith and fair dealing by which the University promised to give full cooperation to Dr. Luck in his performance and to refrain from doing any act that would prevent or impede Dr. Luck from performing all of the conditions of his employment and to refrain from any act that would prevent or impede Dr. Luck's enjoyment of the benefits of his employment contract.

124.   The covenant of good faith and fair dealing required the University to fairly, honestly, and reasonably perform the terms and conditions of the employment contract.  A covenant of good faith and fair dealing inheres in every contract and in particular is implied in the terms of Dr. Luck's employment agreement with the University by reason of, but not limited to, Dr. Luck's outstanding performance for the University, and the University's policies of dealing in good faith with its employees.

ROSEN ✧ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

125.   The University's conduct was wrongful, in bad faith, arbitrary and unfair, and therefore in breach of said covenant in that Plaintiff was constructively terminated.

126.   As a direct and proximate result of the aforesaid wrongful conduct of the University, and DOES 1 through 10, Dr. Luck has suffered economic harm, including, but not limited to, a loss of past and future earnings, as well as a loss of earning capacity and employment benefits, and consequential damages, all within the jurisdictional limits of this court.  The exact amount of said losses will be stated according to proof at trial.

## NINTH CAUSE OF ACTION
## VIOLATION OF *PENAL CODE* §632
### Against Defendants University of San Diego, David Shirk and
### DOES 1-10

127.   Plaintiff incorporates by reference paragraphs 1-63 of this complaint as if fully set forth herein.

128.   Shirk violated Dr. Luck's right to privacy by intentionally electronically recording several conversations, including, the conversation by and between Dr. Luck, Defendant Shirk and Provost Sullivan, on March 11, 2013. Additionally, Defendant secretly recorded at least three conversations between Defendant Shirk and Dr. Luck on February 5, 2013, February 12, 2013, and March 6, 2013.

129.   Dr. Luck had a reasonable expectation that those conversations were not being recorded.

130.   Defendant Shirk did not have the consent of all parties to electronically record the conversations.

131.   The conduct of Shirk was the substantial cause of harm to Dr. Luck.

ROSEN ✧ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

132.   The University knew of Shirk's conduct and that he was secretly electronically recording conversations and ratified his conduct.  Moreover, at the time the conversations were secretly recorded, Shirk was the Director of TBI, which is a supervisory position.  Accordingly, the University is responsible for the conduct of Shirk under the doctrine of respondeat superior.

133.   Dr. Luck is entitled to statutory damages pursuant to California *Penal Code* §637.2, including the greater of either $5,000 or three times the amount of actual damages.

134.   As a direct and proximate result of the aforesaid conduct of the University, Shirk, and DOES 1 through 10, Dr. Luck has suffered severe damage to his professional reputation and emotional distress, including, but not limited to, fear, humiliation, embarrassment, mental anguish, and depression, all to his general damage, in an amount to be stated according to proof at trial.

135.   As a direct and proximate result of the aforesaid wrongful conduct of the University, Shirk, and DOES 1 through 10, Dr. Luck has suffered economic harm, including, but not limited to, a loss of past and future earnings, as well as a loss of earning capacity and employment benefits, and consequential damages, all within the jurisdictional limits of this court.  The exact amount of said losses will be stated according to proof at trial.

136.   Dr. Luck is also entitled to punitive and exemplary damages against the University, Shirk, and DOES 1 through 10 in a sum in excess of the minimum jurisdictional limits of the Court.

///

///

**TENTH CAUSE OF ACTION**

**DEFAMATION**

**Against Defendants University of San Diego, Ami Carpenter and**
**DOES 1-10**

137.   Plaintiff incorporate by reference paragraphs 1-63 of this complaint as if fully set forth herein.

138.   Carpenter made at least one malicious and false statement to University personnel that Dr. Luck discriminates against women.  These statements were false and were designed to directly injure Dr. Luck's professional reputation by imputing that he is generally disqualified to be Dean of the Kroc School.  These statements have a natural tendency to lessen Dr. Luck's profits in his profession.

139.   All persons who received the malicious and false statements reasonably understood the statements were about Dr. Luck.  As a result of the facts and circumstances known to the listeners or readers of the statements, these statements intended to injure Dr. Luck in his occupation and further expose him to hatred, contempt, ridicule and shame.

140.   The University knew of Carpenter's wrongful conduct and ratified this conduct.  Accordingly, the University is responsible for the conduct of Carpenter under the doctrine of respondeat superior. The false statements were a substantial factor in causing harm to Dr. Luck.

141.   As a direct and proximate result of the aforesaid conduct, Dr. Luck suffered harm to his profession.

142.   As a direct and proximate result of the aforesaid conduct of the University, Carpenter, and DOES 1 through 10, Dr. Luck has suffered severe damage to his  professional reputation and emotional distress, including, but not limited to, fear, humiliation, embarrassment, mental anguish, and depression, all to his general damage, in an amount to be stated according to proof at trial.

ROSEN ◇ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

143.   As a direct and proximate result of the aforesaid wrongful conduct of the University, Shirk, Carpenter and DOES 1 through 10, Dr. Luck has suffered economic harm, including, but not limited to, a loss of past and future earnings, as well as a loss of earning capacity and employment benefits, and consequential damages, all within the jurisdictional limits of this court.  The exact amount of said losses will be stated according to proof at trial.

144.  Dr. Luck is also entitled to punitive and exemplary damages against the University, Carpenter, and DOES 1 through 10 in a sum in excess of the minimum jurisdictional limits of the Court.

## DEMAND FOR JURY TRIAL

145.  Plaintiff demands a trial by jury for all claims of relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, and each of them, as follows:

(1)     For general damages for reputational harm, pain and suffering, mental and emotional trauma, and for the loss of enjoyment of the activities of life, according to proof;

(2)     For past and future lost earnings, benefits, and consequential damages, and lost earning capacity, according to proof;

(3)     For exemplary damages, in the causes of action in which punitive damages are pled herein, against each individual Defendant in an amount sufficient to make an example of each Defendant and to deter them and all others who would behave as Defendants have herein;

(4)     For costs of suit, according to proof;

(5)     For prejudgment interest, according to proof; and

COMPLAINT

ROSEN ✦ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

1        (6)    For such other and further relief as the Court deems just and proper.

2

3    DATED:  December 18, 2013          **ROSEN ✦ SABA, LLP**

4

5                     By:    /s/   Momo E. Takahashi

6                            Ryan D. Saba, Esq.

7                            Momo E. Takahashi, Esq.

                            Attorneys for Plaintiff,

8                            EDWARD C. LUCK, Ph.D

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROSEN ✦ SABA, LLP
468 NORTH CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210